**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| TYRONDA JAMES,<br>    *Plaintiff*,<br><br>    v.<br><br>RD AMERICA, LLC, *d/b/a* Restaurant Depot,<br>JETRO HOLDINGS, LLC, *d/b/a* Restaurant<br>Depot, RESTAURANT DEPOT, LLC, *d/b/a*<br>Restaurant Depot,<br>    *Defendants*. | No. 3:16-cv-1445 (VAB) |

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

On August 24, 2016, Tyronda James ("Plaintiff") sued RD America, LLC, Jetro

Holdings, LLC, and Restaurant Depot, LLC ("Defendants"), alleging that she was fired on the

basis of race, subjected to a hostile work environment, and retaliated against for protected

activity, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

Complaint, dated Aug. 24, 2016 ("Compl."), ECF No. 1.

On March 5, 2018, Defendants moved for summary judgment on all of Plaintiff's claims.

Defendants' Motion for Summary Judgment, dated Mar. 5, 2018 ("Mot. Summ. J."), ECF No.

37; Defendants' Memorandum of Law in Support of Mot. Summ. J., dated Mar. 5, 2018 ("Defs.'

Mem."), ECF No. 38.

For the following reasons, the motion for summary judgment is **GRANTED IN PART**

**AND DENIED IN PART**.

Summary judgment is granted as to Plaintiff's claims of discriminatory firing and

retaliation, but denied as to Plaintiff's claim of hostile work environment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual Allegations[1]

Tyronda James, an African-American woman, worked as a Front End Manager at the Restaurant Depot store located at 181 Marsh Hill Road in Orange, Connecticut beginning in March 2013.[2] Defendants' Statement of Material Facts ("Defs.' SMF") ¶¶ 1, 3, ECF No. 39; Plaintiff's Statement of Material Facts ("Pl.'s SMF"), ECF No. 50, ¶ 1; Compl. at 1–2.

Defendants are limited liability corporations ("LLCs") incorporated in Delaware. Compl. ¶ 2. RD America, LLC and Restaurant Depot, LLC are registered in Connecticut as foreign LLCs. *Id.* Defendants all do business as Restaurant Depot. *See* Compl. at 1.

Restaurant Depot, a national chain of retail stores, sells wholesale food to restaurants. Deposition of Tyronda James, dated Sept. 14, 2017 ("James Dep."), annexed as Ex. 1 to Defs.' Mem, at 20:1–3.

As a Front End Manager, James supervised a team of cashiers in the "Front End" department of the Orange store. James Dep. 19:20–25. Her daily duties included

> [c]oming in in the morning and checking the schedule to see who was supposed to be there, setting up the cash registers with the tills, making sure that the tills were counted correctly by the cashiers, and servicing the customers as they enter, and getting the lines moved and the customers out the door. Customers' carts have to be counted before they can exit. So I would either have my supervisors count it – cashier has to count it, the supervisor have to count it, and then I have to count it again.

James Dep. 21:13–22. At the time of her hire, Ms. James reported to Timothy Coleman, a branch manager, as well as to more than one assistant manager. *Id.* at 22:10–18.

---

[1] The following facts are undisputed unless indicated otherwise.

[2] Defendants refer to Jetro Holdings, LLC, RD America, LLC, Depot Restaurant, LLC collectively as "Restaurant Depot." Defs.' SMF ¶ 1.

On April 23, 2013—her second month on the job—Ms. James was disciplined for a $110 cash shortage. Defs.' SMF ¶ 5; Ex. 2 to Defs.' Mem. ("April 23 Disciplinary Form"). Ms. James does not dispute that she was disciplined, but alleges that it was originally a verbal warning modified to say "written" after she had signed it. Pl.'s SMF ¶ 5; Affidavit of Tyronda James, dated Apr. 8, 2018 ("James Aff."), annexed as Ex. N to Pl.'s SMF, ECF No. 50-13, ¶ 7. She further alleges that Monica Franco counted her cash drawer outside of her presence. James Aff. ¶ 7.

On May 9, 2013, Ms. James allegedly received a Discipline Action for failure to adhere to a policy for "voiding total lost receipt." Defs.' SMF ¶ 6; Ex. 3 to Defs.' Mem. ("May 9 Disciplinary Form"). Ms. James denies that she received a written Discipline Action and asserts instead that "[t]he Disciplinary Action dated 5/9/13 was not signed by my manager and was fabricated before or for this litigation," that "[t]he document was tampered with and you can clearly see the erasure marks," and "[t]hat is not my signature." James Aff. ¶ 9.

On June 7, 2013, Defendants allege that Ms. James received a Disciplinary Action for permitting a cashier to enter an incorrect weight for store merchandise, which resulted in a $127.27 loss for the store. Defs.' SMF ¶ 7; Ex. 4 to Defs.' Mem. ("June 7 Disciplinary Form"). Ms. James denies receiving this Disciplinary Action. Pl.'s SMF ¶ 7. She states:

> The Disciplinary Action dated 6/7/13 was an incident that occurred wherein the weight on tag of the merchandise was in error or was illegible. It was not a written warning, it was a verbal warning, and the document was tampered with and not signed by my manager, Timothy Coleman. The second signature is not clear and is not someone who can discipline me. No white manager ever gets written up for this type of error.

James Aff. ¶ 10.

On June 17, 2013, Defendants allege that Ms. James received a Disciplinary Action for failing to complete a task in a reasonable amount of time. Defs.' SMF ¶ 8; Ex. 5 to Defs.' Mem.

("June 17 Disciplinary Form"). Ms. James denies receiving this Disciplinary Action as well. Pl.'s SMF ¶ 8. She states that "[t]he Disciplinary Action dated 6/17/13 was fabricated before or for this litigation," that "wrapping pallets is not in [her] job function," and that "Timothy Coleman did not sign it." James Aff. ¶ 11.

On March 7, 2014, Defendants allege that Ms. James received a Disciplinary Action for poor work quality, and a "coaching report" indicating that she had failed to ensure that the registers worked properly. Defs.' SMF ¶ 9; Ex. 6 to Defs.' Mem. ("March 7 Disciplinary Form"). Ms. James objects, Pl.'s SMF ¶ 9, and claims that "[t]he Disciplinary Action dated 3/7/14 was fabricated before or for this litigation," and "is not signed by [Ms. James] or [her] manager Timothy Coleman." James Aff. ¶ 12.

On March 10, 2014, Defendants allege that Ms. James received a Disciplinary Action again for poor work quality, which this time included a "coaching report" indicating that she had failed to keep the front end clean. Defs.' SMF ¶ 10; Ex. 7 to Defs.' Mem. ("March 10 Disciplinary Form"). Ms. James objects, Pl.'s SMF ¶ 10, and again claims that "[t]he Disciplinary Action dated 3/10/14 was fabricated before or for this litigation" and "is not signed by [Ms. James] or [her] manager Timothy Coleman." James Aff. ¶ 13.

On March 20, 2014, Ms. James wrote a letter to Timothy Coleman and the "Jetro Cash and Carry Corporate Office." Defs.' SMF ¶ 15; Pl.'s SMF ¶ 15; Ex. 13 to Defs.' Mem.; Ex. G to Pl.'s SMF ("March 20, 2014 Letter"). She complained about being disrespected by upper management, and being subjected to unbearable working conditions at Restaurant Depot because she was an African-American woman. *Id.* The letter states:

> On several occasion [sic] members of upper management have under-minded [sic] and disrespected me in front of my associates. This kind of behavior has been brought to the attention of Tim on several occasions. Awilda went behind my back and ask [sic] a new

cashier (Reggie) who had only been working here for two days, to assist them in spying on the staff members of the front-end. The cashier was called on his personal cell phone by Inventory Manager and ask [sic] to assist in spying on all the associates on the front-end who might be stealing. In addition on March 20, 2014 Inventory Manager Awilda ask [sic] supervisor Yvonne to train the new upcoming supervisor,· Debra. Awilda ask [sic] this question on the floor in front of the Front-End manger Tyronda James, When I responded I had already be working with her. She ignored me and told Yvonne someone needs to train her with some knowledge and direct Yvonne to tell Leesha to train her. The working conditions at this company are becoming unbearable, I feel being a african-American [sic] female has a lot to do with it. I feel the upper management feels a blantant [sic] disrespect and disregard for Afraican-American [sic] authority.

March 20, 2014 Letter. In her affidavit, Ms. James alleges that, during the course of her employment, she "complained to Timothy Coleman about harassment, discrimination and retaliation." James Aff. ¶ 5. She allegedly did this not only in the March 20, 2014 letter, but also in letters dated April 29 and June 27, "and at least 4 other times in writing and daily complaints verbally." *Id.*

Ms. James's affidavit alleges that Inventory Manager Awilda Pillard "used the word 'my-n—ga' daily," which she found offensive. James Aff. ¶ 19. Her affidavit also alleges that HR Manager Monica Franco: (1) called her "stupid" in front of "staff and subordinates"; (2) "shoved papers into my stomach while I was on the phone with a customer," "in front of staff and my subordinates"; and (3) blocked her from assisting an injured white female cashier, telling Ms. James not to come near her. *Id.* ¶¶ 21–23.

The affidavit also alleges that both Ms. Pillard and Ms. Franco "undermined my authority as a manager by changing my instructions to my subordinates, humiliating and belittling me in front of my coworkers and subordinates, refusing to help my department when they were called, telling a coworker 'glad that black bitch is gone,' telling a new employee to spy on me to see if I

5

am stealing (increased scrutiny other managers did not have), [and] speaking to me in a disrespectful manner in front of my employees and other staff." *Id.* ¶ 20.

On May 6, 2014, Defendants allege that Ms. James received a Disciplinary Action for failing to cash out her drawer before leaving work for the previous day, despite allegedly having signed a notice on April 10, 2014 that failure to do so would result in her being written up. Defs.' SMF ¶ 11; Ex. 8 to Defs.' Mem. ("May 6 Disciplinary Form"). Ms. James objects, Pl.'s SMF ¶ 11, and, once again, claims that "[t]he Disciplinary Action dated 5/5/14[3] is not my signature, the dates look tampered with, and I have never seen the document before." James Aff. ¶ 14.

On or around May 17, 2014, Jose Pena replaced Timothy Coleman as the Store Manager for the Orange store. Deposition of Jose Pena, dated June 14, 2018 ("Pena Dep."), annexed to Plaintiff's Supplemental Objection to Mot. Summ. J., ECF No. 58-1, at 12:9–19.

On June 11, 2014, Defendants allege that Ms. James received a Disciplinary Action after a conversation about her personal shopping at Restaurant Depot, and "[t]he conversation included ensuring that anyone shopping for James on her account were signatories of her account." Defs.' SMF ¶ 12; Ex. 9 to Defs.' Mem. ("June 11 Disciplinary Form"). The Disciplinary Action states:

> **DETAILS:**
> As a Front End Manager with a RD account there is a concern over a conflict of interest when purchasing merchandise through the company. While we may appreciate your business you are required to ensure that there is absolutely [no] impropriety. Therefore, you are expected to follow the rules and guidelines as a customer would. Starting with ensuring those who you employ to shop under your numbers are required to become signatory on the account, including having the proper rights to use your credit cards and checks. Please be reminded you can not use company time to make purchases or payments. Returns, of merchandise will be done properly without exception. If there is an issue of credits, exchanges, etc. you are to

---

[3] The form is dated effective May 6, 2014. May 5, 2014 is noted on the form as the date Ms. James failed to cash out her drawer. *See* May 6 Disciplinary Form.

> bring those issues directly to my attention and I will make the final decisions, In the event of my absence, I will assign the appropriate party who may required to provide a written statement of the transaction you have requested.
>
> **CORRECTIVE ACTION PLAN:**
> Tyronda is required to have the proper signed paperwork for his [sic] employee (s) to shop and any returns must be conducted as stated above.

June 11 Disciplinary Form. Mr. Pena testified that he raised the issue because Ms. James—who was responsible for verifying and authorizing customer purchases before cashiers could complete the transaction and allow them to exit the store—should not be playing this role with respect to any transactions being made by friends or associates in relation to her business:

> So we had a conversation based on the way she was handling her account, meaning you're not to supposed you know, like let's say you have a cashier and a sister or someone come in, that cashier [sic] not supposed to scan that person going through because it's kind of like a conflict of interest . . . . Somebody else should check out or a supervisor have a mother or sister there, that supervisor should not be able to, you know, check on the receipt of that person or check that person out because it would be a conflict of interest . . . .
>
> I never questioned her shopping in the store. If she's shopping, she shouldn't do it on store time but she can shop in the store. My conversation with her was strictly based on the people that shopped for her, she's not to oversee those transactions . . . .

Pena Dep. at 61:15–62:3, 79:5–9.

Ms. James objects to Defendants' characterization of the June 11, 2014 incident. Pl.'s SMF ¶ 12. She claims that while she signed the Disciplinary Action,

> the information is false. I was not in violation of a company policy. They created a policy just for me. Chez Darden told Jose Pena to take it out of my file because I was being singled out. Chez Darden and Jose Pena agreed that it would be taken out of my file and they never did take it out. Statements were added after I signed it because the typed information was not in there when I signed. The milk receipt transaction in question was handled by Alex Lowery not me.

James Aff. ¶ 15.

7

On June 14, 2014, a day when Mr. Pena was not in the store, Defendants assert that Ms. James twice used her work identification to authorize shopping done on her behalf, contradicting the explicit instructions Defendants claim Mr. Pena gave her. Defs.' SMF ¶ 13; Ex. 10 to Defs.' Mem. ("June 19 Disciplinary Form"); Ex. 11 to Defs.' Mem. ("Personnel Action Form"). The Disciplinary Action issued several days later states that, "[o]n 6/14, Tyronda shopped twice which was Jose's day off. Also, she used her manager ID on the account which should not be happening at all." June 19 Disciplinary Form.

Ms. James objects to this account of the day's events. Pl.'s SMF ¶ 13. She asserts that she "never tampered with [her] account" and was "setup to be forced to handle [her] account and keep the line moving because the Manager Joey refused to assist with the transaction." James Aff. ¶ 16.

On June 19, 2014, Defendants allege that Ms. James "was going to be given a final warning regarding her personal shopping at Restaurant Depot but as a result of her behavior during the meeting to address her warning, she was terminated." Defs.' SMF ¶ 14; June 19 Disciplinary Form; Personnel Action Form. Shez Darden, a regional HR representative for Defendants, participated by telephone. The Disciplinary Action describes the events of the day as follows:

> On 6/11, there was a conversation with Tyronda, per Shez Darden, in regards to Tyronda shopping when Jose is not present or verified by another manager on duty. On 6/14, Tyronda shopped twice which was Jose's day off. Also, she used her manager ID on the account which should not be happening at all. On 6/19, Tyronda was brought into the office and was going to be given a final warning per Shez Darden in regards to this. When Shez began speaking to Tyronda-Tyronda began to yell and scream at Shez. At this point, Shez recommended termination. Tyronda then left the office after yelling and slamming a clipboard on the desk. Once Shez hung up, Tyronda was brought back into the office with both ABMs [Assistant Branch Managers] and the admin asst and she was terminated. As leaving

the office, Jose was talking to her and she slammed the door behind her in his face. She was slamming and left the building.

June 19 Disciplinary Form.

> Ms. James objects. Pl.'s SMF ¶ 14. She contends:

>> The Disciplinary Action dated 6/19/14 was fabricated and tampered with and I was again falsely accused of tampering with my own account. Typed statements were added and subtracted after I signed it because the typed information was not in there when I signed.

James Aff. ¶ 17. Ms. James also disputes several details of the account. She claims: (1) Shez Darden started screaming at her, not the other way around; (2) that she did not scream back, but simply told her "Don't talk to me and speak to me in that manner; it was inappropriate and unprofessional."; (3) that she never raised her voice to Shez Darden; (4) that she may have raised her voice to Jose. James Dep. 70:2–19. She testifies that the exchange with Ms. Darden proceeded as follows:

>> I was called -- José came to me on the floor and asked me to come into the office. And as I entered the office, José said, "Tyronda is in the office," and I sat down. And then from the speaker phone I heard somebody yelling, "What did I tell you? What did I tell you?" And I said basically, "Who is that?" You know. And I didn't know what she was talking about. So I told her, I said, "First of all, do not speak to me in that manner or that tone of voice." And she said to me, we was going back and forth about the way she was yelling and screaming at me. And I kept telling her, "Don't speak to me in that tone." And she kept yelling and screaming. And then she said that, she told him -- we never got a chance to talk about anything else. She told him that, "Fire her." That's what she said. And that was the gist of that conversation. And I left out of the office. I don't remember why, but then a few minutes later, I remember him coming to get me to come back to the office. And I come back in the office. I asked him what was he going to do. He did call for assistant managers to come. Neither one of them would come. And I asked him what was he going to do? And he said, "She said for me to fire you." I said, "Well, what are you going to do?" You know. "I need to know if you're going to fire me." And he said, "Yeah, you're fired." And then after he fired me, I left.

*Id.* 72:17–73:18. Ms. James then testified that she returned to the office and added a handwritten statement to her Disciplinary Action form. *Id.* 73:19–74:8. That statement, which continues onto an attached page, reads as follows:

> First offense was unfounded Jose told Tyronda he was sorry for the misunderstanding and – And he spoke with Shez and she said to disregard the first write-up. In addition the second incident occured because manager Joey refused to give cutomer who was shopping with my card her change. So I had no other choice but to F-6 the balance. Therefore I'm being wrongfull terminated.

*See* Disciplinary Action Form, dated June 19, 2014, annexed as Ex. D to Pl.'s SMF, ECF No. 50-4, at 11–12. The attached page containing the sentences beginning "And he spoke" was not included in Defendants' exhibit of the same form. *Compare id.*, *with* June 19 Disciplinary Form, Ex. 10 to Defs.' Mem.

Ms. James alleges that, in the wake of her firing, Defendants closed her business's account with Restaurant Depot "and continued to harass [her] family members." James Aff. ¶ 24. She claims that Defendants "kicked [her] brother (Office[r] Robert Hayden) out of the store and called the police on [her] sister." *Id.* ¶ 25.

## B. Procedural History

On August 24, 2016, Ms. James filed this lawsuit, alleging that Defendants terminated her on the basis of race in violation of Title VII, 42 U.S.C. § 2000e(k). *See* Compl. ¶¶ 21–22. Ms. James also alleges that Defendants created a hostile work environment. *Id.* ¶¶ 23–28. Finally, Ms. James alleges that Defendants retaliated against her for the exercise of her rights under Title VII. *Id.* ¶¶ 29–30.

On November 10, 2016, Defendants filed an Answer with affirmative defenses. Answer, ECF No. 13. Defendants contend, *inter alia*, that they fired Ms. James for legitimate, non-

discriminatory reasons: namely, for the issues raised in her eight disciplinary actions, as well as her conduct during a final meeting held to address those issues. *Id.*

The parties spent approximately thirteen months in discovery, which closed on February 1, 2018. *See* Scheduling Order, dated Jan. 17, 2017, ECF No. 18; Notice of E-Filed Calendar, dated Dec. 15, 2017, ECF No. 30.

On March 5, 2018, Defendants moved for summary judgment. Mot. Summ. J. Defendants argued that no material facts are in dispute in this matter and that "[t]he record unequivocally shows that James may have *subjectively* felt that her termination was based on her race or due to some sort of alleged retaliation by Restaurant Depot, but there is absolutely no evidence that (1) James was terminated or otherwise discriminated against based on her race; (2) that James was harassed in any way or was subjected to a hostile work environment; and/or (3) that James was in any way retaliated against by Restaurant Depot." Defs.' Mem. at 3. Defendants also argue that "the evidence in this case also unequivocally shows that James and Restaurant Depot agreed to address all disputes by means of arbitration and as a result, James's entire complaint must be dismissed and judgment should enter in the Defendants' favor." *Id.*

Ms. James opposed the motion for summary judgment, arguing that there are genuine issues of material fact over whether she was subjected to racial discrimination in violation of Title VII, whether "this race discrimination led to harassment and a hostile work environment," and whether "she was ultimately fired in retaliation for her written and verbal complaints, that her unrelated business account was terminated by the defendants in retaliation after she was fired, and that her family members and friends were targeted and harassed." Plaintiff's Memorandum in Opposition to Mot. Summ. J., dated Apr. 10, 2018 ("Pl.'s Mem."), ECF No. 49, at 2. She further argues that Defendants "interfered with her business account in retaliation just

before and after they closed it, creating policies specifically for the use of her account, and singling her out to discriminate against, harass and vex her." *Id.*

On August 15, 2018, the Court held a hearing on the motion for summary judgment and reserved decision. Minute Entry, dated Aug. 15, 2018, ECF No. 57. The Court then permitted the parties to file supplemental briefing, particularly to permit Plaintiffs to further address the threshold arbitration issue raised by Defendants. *Id.*

On September 7, 2018, Ms. James filed a supplemental memorandum to the motion to dismiss. Plaintiff's Supplemental Objection to Mot. for Summ. J., dated Sept. 7, 2018 ("Pl.'s Supp. Opp."), ECF No. 58.

On September 14, 2018, Defendants filed a reply memorandum to Ms. James's supplemental memorandum. Defendant's Reply to Pl.'s Supp. Opp., dated Sept. 14, 2018 ("Defs.' Supp. Reply"), ECF No. 59.

On September 21, 2018, Ms. James moved to consolidate her case with another action involving a co-worker, Shirley Tapper, suing Defendants, *Tapper v. Jetro Holdings, LLC*, No. 3:16-cv-1446 (MPS), then pending before Judge Michael P. Shea, Motion to Consolidate Cases, dated Sept. 21, 2018, ECF No. 60, but now closed. *See* Order of Dismissal with Prejudice, dated Dec. 13, 2018, *Tapper v. Jetro Holdings, LLC*, No. 3:16-cv-1446 (MPS), ECF No. 53.

On October 2, 2018, Defendants opposed the motion to consolidate. Objection to Motion to Consolidate, dated Oct. 2, 2018, ECF No. 61.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

### A. Arbitration Agreement

Defendants argue that Ms. James signed a valid agreement to arbitrate, and that they are entitled to summary judgment because these claims fall within the scope of that agreement and the Court effectively has no jurisdiction over the claims.

The Court disagrees.

Typically a party seeking to invoke an arbitration agreement will do so early in the life of a case, i.e. through a motion to compel arbitration, so as to avoid the costs of litigation. Nevertheless, Defendants are likely not barred from now raising the existence of an arbitration agreement at summary judgment, particularly because Plaintiff was put on notice by Defendants' assertion of the arbitration agreement as an affirmative defense. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995) ("Whether or not there has been a waiver is decided in the context of the case, with a healthy regard for the policy of promoting arbitration . . . . Although litigation of substantial material issues may amount to waiver, delay in seeking arbitration does not create a waiver unless it prejudices the opposing party.") (citations omitted); *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991) ("Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense."); *Com-Tech Assocs. v. Comput. Assocs. Int'l*, 938 F.2d 1574, 1576–77 (2d Cir. 1991) ("The protracted litigation which preceded the motion to arbitrate compels us to affirm the district court's holding that defendants waived their contractual right to compel arbitration. The defendants did not assert the defense of arbitration in either of their answers.. . . . This case is distinguishable from *Sweater Bee*, where we found that the defendants did not waive their right to compel arbitration by participating in discovery for two years and by filing a motion under Fed. R. Civ. P. 12(b)(6) to dismiss the amended complaint. In *Sweater Bee*, the defendants had previously asserted arbitration as a defense in their answer.") (citing *Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457, 463 (2d Cir. 1985)).

In the Second Circuit, courts follow a two-part test to determine whether claims are subject to arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

Defendants claim that there is no dispute as to whether the parties agreed to arbitrate the claims between them, as Ms. James has admitted that she signed an agreement to arbitrate. *See* Pl.'s SMF ¶ 1. Defendants have also placed three documents into the record on this issue: (1) an Arbitration Agreement bearing the date 01/01/15 and unsigned, *see* Ex. 14 to Defs.' Mem.; (2) a document titled "Acknowledgments," signed by Ms. James and dated March 4, 2013, *see* Ex. 15 to Defs.' Mem.; and (3) a document titled "Arbitration Policy Acknowledgment," signed by Ms. James and dated March 29, 2013, *see* Ex. 15 to Defs.' Mem. Defendants' initial briefing referred to the first document, Exhibit 14, as though it was the contemporaneous arbitration agreement that Ms. James signed. *See* Defs.' Mem. at 14.

Defendants are correct that Ms. James does not dispute that she signed an agreement to arbitrate. *See* Pl.'s SMF ¶ 1.

But Ms. James argues that Defendants have submitted an agreement that appears to have been created after her termination, and which she therefore is not bound by. *See* Pl.'s Supp. Opp. at 7 ("The court is charged with determining the plain language of the document, [but] it cannot do so without receipt of the full document and all language included therein . . . the alleged agreement submitted was dated 2015 and was not signed.").

Ms. James is correct. All of the putative Agreement's pages include, in the bottom-right corner of the page, the phrase: "(ALL STATES EXCEPT CALIFORNIA 01/01/15)," suggesting a date of execution after her termination. *See* Ex. 14 to Defs.' Mem.

Defendants fail to address this argument directly. They instead construe Ms. James as arguing that her agreement is not valid "because the actual arbitration pages are not signed by the plaintiff." Defs.' Supp. Reply at 2. In response, they contend that "[w]hen 'signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties.'" *Id.* at 2–3 (quoting *Allstate Life Ins. Co. v. BFA Ltd. P'ship*, 287 Conn. 307, 315 (2008). They assert that the signature pages represent a complete contract that incorporated by reference the terms of the arbitration agreement, and thus that agreement did not need, under Connecticut law, to be "attached, signed, or initialed unless the contract specifies that they need to be." *Id.* (citing *566 New Park Assocs. v. Blardo*, 97 Conn. App. 803, 906 (2006)).

In *Blardo*, however, the state court had erroneously deemed a document incorporated by reference not to be in evidence when it had in fact been introduced as a full exhibit at trial and plaintiffs had testified to its terms. *See Blardo*, 97 Conn. App. at 809 ("In its memorandum of decision, the court expressly concluded that A205 was not in evidence. Specifically, it stated that there was 'no such document in evidence signed or unsigned . . . .' The record, however, belies this conclusion. As noted previously, A205 was introduced as a full exhibit, and testimony was offered as to its terms. In light of the record in the present case, we conclude that the court improperly determined that A205 was not in evidence.") (footnote omitted). The refusal to regard the properly-introduced exhibit, which was clearly identified in the contract, as having been incorporated by reference was the legal error identified by the appellate court. *Id.* at 811–12 ("In the present case, the language of the contract clearly and unambiguously refers to A205 as

part of the contract . . . . Accordingly, we conclude that the court improperly determined that A205 was not part of the contract.").

Here, however, it is not clear whether the document allegedly incorporated by reference into the signed signature pages is in the record.

Absent clarity about whether the agreement in the record is the one signed by Ms. James, the Court cannot determine, at the summary judgment stage, whether a valid agreement to arbitrate was entered into, or whether these claims fall within the scope of that agreement. Defendants therefore do not meet their burden of showing an absence of a genuine dispute of material fact.

Accordingly, the Court denies summary judgment on this basis.

**B.** ***Prima Facie* Showing of Discrimination**

Defendants argue that Ms. James has not established a *prima facie* case of discrimination because she has no evidence establishing that her firing occurred under circumstances permitting an inference of discrimination.

The Court disagrees.

Title VII prohibits employers from discriminating on the basis of race. 42 U.S.C. § 2000e-2(a)(1). Employment discrimination claims under Title VII are subject to the three-step burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). To overcome a motion for summary judgment under the *McDonnell Douglas* framework, "[t]he plaintiff . . . must first establish by a preponderance of the evidence, a prima facie case of . . . discrimination." *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (internal quotation marks omitted).

The burden of establishing a *prima facie* case is minimal. *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal.") (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)). To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show: (1) that she was a member of a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; and (4) that the circumstances surrounding the adverse employment action permit an inference of discrimination. *See Feingold v. New York,* 366 F.3d 138, 152 (2d Cir. 2004); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).

Defendants do not dispute that Ms. James—an African-American woman who was qualified for her position and was terminated—has made out the first three elements of her *prima facie* case. They argue, however, that she cannot prove the fourth element: that she was fired under circumstances that permit an inference of discrimination. Defs.' Mem. at 8. Defendants argue that Ms. James was not fired under circumstances permitting a rational finder of fact to infer a discriminatory motive because she has failed to provide evidence "that other similarly situated individuals of a different race were treated differently than she was." *Id.* Defendants argue that Ms. James "has produced **no** evidence that similarly situated employees were treated differently than she was," and that even her testimony to that effect, accepted as true, cannot "show that other similarly situated managers engaged in conduct that was as serious as that of James." *Id.* at 8–9. They therefore argue that none of her fellow department managers were "similarly situated." *Id.*

 It is well established in the Second Circuit, however, that evidence regarding the treatment of similarly situated employees (also known as "comparator evidence") is only one

way to establish the fourth element of a *prima facie* case of discrimination. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467–68 (2d Cir. 2001) ("[W]e conclude that a showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to discharge that burden. This position is consistent with our prior decision in *Chambers,* where we wrote that the inference of discriminatory intent could be drawn in several circumstances including, but not limited to: 'the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'") (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 2001)).

Here, Ms. James has alleged that before her termination, Defendants were engaged in a pattern of conduct where black cashiers were routinely disciplined harshly—and regularly fired—for shortages on their cash registers, while non-black cashiers were not, and were routinely given alternative options to correct such shortages. She has cited specific examples of such individuals, and those examples have not been refuted by Defendants. Her contentions about this disparate treatment of cashiers are also supported by the affidavit of one of those cashiers, Todd Reynolds. *See* Affidavit of Todd Reynolds, dated Mar. 5, 2018 ("Reynolds Aff."), annexed as Ex. N to Pl.'s SMF, ECF No. 50-13, at ¶¶ 7–12 ("I was targeted and I was fired because my drawer was short over limit. I was never suspended, given a written warning, or a verbal warning because my drawer was short . . . . [I]t was a daily thing where someone was always short, and it was the African Americans who were always fired for it . . . . There was a

Hispanic girl named Sandy, who told me that she was short more than the average $500 or more, and she was allowed to pay the money back from her next check.").

Ms. James has also documented that she raised concerns with store manager Timothy Coleman on at least one occasion about treatment that she felt was discriminatory and inappropriate in the months leading up to her termination. *See* Ex. 12 to Defs.' Mem (March 20, 2014 letter from Ms. James to Timothy Coleman stating "I feel the upper management feels a blatant disrespect and disregard for African-American authority"). She has also stated that she was subjected to routine use of the racial epithets "n—ga" and "n—ger" by Ms. Pillard. *See infra* at § III(D).

While these circumstances may not be sufficient to prove a discriminatory motive, Ms. James has met the "minimal" burden of establishing a *prima facie* case. *See Walsh*, 828 F.3d at 75 ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal.") (quoting *Norton*, 145 F.3d at 118).

The Court therefore denies Defendants' motion for summary judgment on this basis.

**C.  Failure to Rebut Defendants' Legitimate, Nondiscriminatory Reason**

Defendants argue that even if Ms. James establishes a *prima facie* case of employment discrimination, her "claims still fail because Restaurant Depot had legitimate, nondiscriminatory reasons for terminating James's employment" that Ms. James has not rebutted through sufficient admissible evidence as to create a genuine issue of material fact about whether those reasons are pretextual. Defs.' Mem. at 9.

The Court agrees.

Defendants argue that Ms. James was reprimanded eight times "for performance issues, before her final warning which resulted in her termination," and "[a]fter each incident, James

was given the opportunity to correct her behavior and failed to do so." *Id.* Defendants argue that, "[b]ased on James's long history of performance issues in the short amount of time she was working for Restaurant Depot, Restaurant Depot clearly had a legitimate, non-discriminatory basis to terminate James's employment that had absolutely <u>nothing</u> to do with her race." *Id.* at 10–11.

In particular, Defendants point to two particular concerns raised in May and June 2014. In May, Ms. James was reprimanded for allowing cashiers to leave their cash drawers behind when they left for the day, in violation of a previously-issued directive from HR Manager Monica Castro. *See* May 6 Disciplinary Form. Then, on June 11, 2014, Jose Pena informed her that she was not permitted to authorize the transactions of customers associated with her side business, Kidz Nutrition, because it could pose a conflict of interest. *See* June 11 Disciplinary Form. However, on June 14, 2014, Ms. James authorized two such transactions. This, Defendants claim, was the primary reason they called Ms. James in for a disciplinary meeting on June 19, 2014, at which she was to be given a final warning. These disciplinary issues, they claim, were valid non-discriminatory reasons to fire Ms. James.

The Court finds Defendants have satisfied their burden of demonstrating a valid, non-discriminatory reason for firing Ms. James. *Abdu-Brisson*, 239 F. 3d at 469 ("A defendant meets his burden [of rebutting a *prima facie* case] if he presents reasons that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'") (quoting *Hicks*, 509 U.S. at 509 and citing *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000)); *see also Hicks*, 509 U.S. at 509 ("In the nature of things, the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

Having made such a showing "the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). Because Ms. James has established a *prima facie* case of discrimination, but Defendants have offered a neutral explanation for her termination, there is no longer a presumption of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (stating that the "presumption of discrimination drops out of the picture once the defendant meets its burden of production").

Ms. James argues that the "[e]vidence also shows that the defendant produced falsified Disciplinary Documents and the Plaintiff was never afforded the process (verbal, written, suspension, final notice, termination) of termination as per company policy." Pl.'s Mem. at 10. In fact, however, Ms. James' own statements are the only evidence. Denying the veracity of the evidence substantiating the valid, non-discriminatory reason offered by Defendants, without more, cannot create a genuine issue of material fact for trial. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("'[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'") (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

At oral argument, Ms. James raised a positive annual employment review she received on March 2, 2014 from her then-branch manager Timothy Coleman and assistant manager Joey Sanchez as evidence, suggesting that the disciplinary record cited by Defendants is pretextual. *See* Performance Appraisal Form, dated Mar. 2, 2014, annexed as Ex. H to Pl.'s SMF, ECF No. 50-8. While this positive review may suggest the disciplinary actions Ms. James received before March 2, 2014 should not have been a factor in the decision to terminate her, this argument leaves wholly unaddressed the evidence in the record of disciplinary actions taken after that

date—specifically, the actions on March 10, 2014, May 5, 2014, and June 11, 2014, as well as Ms. James's alleged actions during the disciplinary meeting that, according to Defendants, prompted her firing.

"[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (internal quotation marks and citations omitted). But "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks*, 509 U.S. at 518.

To meet that burden, Ms. James would need to provide evidence supporting her contention that Defendants' stated reason for firing her is pretextual and that the decision was, at least in part, motivated by discrimination—evidence from which the jury could reasonably base its finding. *See Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011) ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.") (citations omitted).

Ms. James has failed to do so, instead relying on an affidavit rife with conclusory and speculative statements regarding the various disciplinary actions taken against her. For example, while Ms. James claims that "[t]he Disciplinary Action dated on 3/10/2014 was fabricated before or for this litigation," James Aff. ¶ 13, she has offered no evidence to support this assertion. Because the conclusory and speculative portions of this affidavit would be inadmissible at trial,

they cannot support denial of a motion for summary judgment now. *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) ("Such testimony, unsupported by documentary or other concrete evidence of the supposed lead line effect, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary."); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."). Significantly, Ms. James also has provided no evidence, admissible or otherwise, to support the notion that a non-black employee engaged in an argument with management regarding disciplinary action would not have been fired as Ms. James was.

As the Supreme Court has acknowledged, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983), which can make proving discrimination in cases such as this especially difficult. Under the Supreme Court's precedents, however, the lack of evidence in a Title VII case is treated as it would be in any other case, and Ms. James has not shown a genuine issue of material fact for a jury to decide. *See Hicks*, 509 U.S. at 524 ("We reaffirm today what we said in *Aikens*: '[T]he question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy. There will seldom be 'eyewitness' testimony as to the employer's mental processes. But none of this means that trial courts or reviewing courts should

treat discrimination differently from other ultimate questions of fact.'") (quoting *Aikens*, 460 U.S. at 716).

Because Ms. James cannot demonstrate that there is evidence to meet her ultimate burden of persuasion, there is no genuine issue of material fact for trial.

Accordingly, Defendants' motion for summary judgment is granted as to Ms. James's claims of discrimination regarding her termination in Count One.

### D. Hostile Work Environment

Defendants further contend that Ms. James has failed to establish that Defendants created a hostile work environment as a matter of law.

The Court disagrees.

To establish a hostile work environment claim under Title VII, a plaintiff must show "that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The plaintiff must show that the workplace is both objectively "severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* The "incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted)).

"There is no 'mathematically precise test,' however, for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment." *Id.* (quoting *Harris*, 510 U.S. at 22–23). "Instead, courts must assess the

totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "The effect of identified incidents on the employee's psychological well-being is also relevant, though not determinative." *Id.* (citing *Harris*, 510 U.S. at 23).

Defendants argue that "sporadic comments, even if actually made to James, which Restaurant Depot denies, are neither severe nor pervasive enough to constitute hostile work environment under Title VII." Defs.' Mem. at 12. Defendants argued that "[b]ecause James cannot prove that the comments made to her at Restaurant Depot were severe or pervasive enough to rise to the level of hostile work environment racial harassment, Restaurant Depot should be entitled to summary judgment on Count II of James's Complaint." *Id.*

Ms. James argues that she was subjected to a hostile work environment because "[s]he was called stupid, ridiculed, undermined and not supported as a manager, asked to harass other employees needlessly, other employees were told to spy on her, and basically treated badly and worse than other white managers." Pl.'s Mem. at 11; *see also* James Aff. ¶¶ 20–22; James Dep. 39:18–25. She argues that the "environment was hostile and abusive toward [her] where it was not toward other white managers." Pl.'s Mem. at 11. These statements, on their own, are too conclusory to demonstrate a genuine issue of material fact.

Ms. James, however, also argues that one senior manager, Awilda Pillard, regularly used racial epithets. *See, e.g.*, James Aff. ¶ 19 (stating that "Awilda used the word 'my-n—ga' daily which was offensive to me."); *id.* ¶ 20 (stating that Awilda said "glad that black bitch is gone"); James Dep. at 41:1–4 ("Awilda often used the N word. She often used 'n—ger' more times than

once and in front of members of management, staff, and it was acceptable."); Supplemental Affidavit of Tyronda James, dated Sept. 5, 2018, annexed to Pl.'s Supp. Opp., ¶ 18 ("Awilda was also constantly using the N-Word in my presence.").[4]

While Ms. Pillard was not Ms. James's primary supervisor, she was considered a senior manager who had both the authority to supervise Ms. James and actually supervised Ms. James. *See* Pena Dep. at 36:14–37:9 (explaining that Ms. Pillard, as inventory controller, was a senior manager who "could" supervise, and "supervised Tyronda a lot.").

Although Ms. James has testified that Ms. Pillard, used the racial epithet often, she has no firsthand knowledge that Ms. Pillard actually said, "glad that black bitch is gone." *See* James Dep. at 31:6–19. As a result, this appears to be inadmissible hearsay that cannot be used to defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) ("This requirement means that hearsay testimony that would not be admissible if testified to at the trial may not properly be set forth in the Rule 56(e) affidavit.") (citations, internal quotation marks, and alterations omitted) (citing pre-restyling version of Fed. R. Civ. P. 56(c)(4)).

Beyond Ms. James's statements, the record contains other evidence as to whether or not Ms. Pillard used these words. Former cashier Todd Reynolds states, in his affidavit, that Ms. Pillard used them regularly. *See* Reynolds Aff. ¶ 33 ("Awilda often used the word N—ger around me in reference to employees. She said things like: "That N—ger getting on my nerves."

---

[4] The Court has replaced the letters "ig" with dashes to avoid reprinting this racial epithet in full, including by altering quotations, consistent with the Chicago Manual of Style. *See* Chicago Manual of Style §§ 5.251, 5.253 (17th ed. 2017).

"These N—gers don't know what they doin." "I'm bout to fire this n—ger." "This n—ger is pissin me off." "What up my n—ger."). Monica Franco testified, however, that she never heard Ms. Pillard use such language. Deposition of Monica Franco, dated Nov. 2, 2017, annexed as Ex. 12 to Defs.' Mem., at 91:12–18. Ms. Franco nevertheless has acknowledged that this racial epithet has been used in this workplace repeatedly. *Id.* at 86:15–23 ("Q. Have you ever heard anyone use the word 'n—ger' in the -- while you were working at Restaurant Depot? A. I've heard it here and there with, you know, employees amongst themselves, but it's never been in an actual yelling at someone in a derogatory way. I don't say it personally myself, I don't feel it should be said. I feel it's definitely offensive. If we ever do hear it, it's something that's handled."); *id.* at 108:19–109:6 ("A. I have never said it myself. There are employees that refer to their friends, but instead of using the e-r, they use the 'a' at the end of it, because they find that to be acceptable. I don't. It's not something I use or practice. Q. Who does that that you know of? A. I don't know anyone specifically. It happens constantly between employees at the store still to this day, that's how they talk to one another. They don't find it as a derogatory way to talk to each other. But when we hear it, we do say something to them in regards to not saying it. If it is used in a derogatory form, then usually we contact corporate in regards to that.").

A reasonable factfinder thus could conclude that the use of this particular racial epithet in this workplace was not merely sporadic. The Second Circuit has recognized that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n—ger' by a supervisor in the presence of his subordinates." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999) (quoting *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)), a*brogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006);

*see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014)

(same); *DiStiso v. Cook*, 691 F.3d 226, 243 (2d Cir. 2012) (same); *La Grande v. DeCrescente*

*Distrib. Co., Inc.*, 370 F. App'x 206, 210 (2d Cir. 2010) (same); *Williams v. Consol. Edison*

*Corp. of N.Y.*, 255 F. App'x 547, 549–50 (2d Cir. 2007) (same); *Ricks v. Conde Nast Publ'ns*, 6

F. App'x 74, 79 (2d Cir. 2001) (same); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir.

2000) (same).

When such serious epithets are used in the workplace, even a single incident might be

sufficient to support a claim for hostile work environment. *See Daniel v. T & M Protection Res.,*

*LLC*, 689 F. App'x 1, 2 (2d Cir. 2017) (summary order). In *Daniel*, a summary order, the Second

Circuit reversed a district court that had concluded that the one-time use of that racial epithet by

a supervisor to a subordinate cannot, by itself, support a hostile work environment claim. *See id.*

("[A]lthough we decline to confront the issue of whether of whether the one-time use of the slur

. . . by a supervisor to a subordinate can, by itself, support a claim for hostile work environment,

we conclude that the district court improperly relied on our precedents when it rejected this

possibility as a matter of law.").

For this conduct to rise to the level of creating a hostile work environment, Ms. James

must show that it was so severe or pervasive that it affected the conditions of her employment.

*See Harris*, 510 U.S. at 21–22 ("Conduct that is not severe or pervasive enough to create an

objectively hostile or abusive work environment—an environment that a reasonable person

would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not

subjectively perceive the environment to be abusive, the conduct has not actually altered

the conditions of the victim's employment, and there is no Title VII violation.").

Here, the evidence as to how much this conduct affected Ms. James's conditions of work is unclear. In her statement to the Connecticut Commission on Human Rights & Opportunities ("CHRO"), Ms. James stated that she had told store manager Timothy Coleman about Ms. Pillard's language, but does not know whether he acted on it. *See* CHRO Charge of Discrimination, dated Oct. 8, 2014, annexed as Ex. A to Pl.'s SMF, ECF No. 50-1, at 5 ("Awilda would frequently use the term . . . which I found offensive and disrespectful. When I told Tim about it, he said that he would talk to her, but I don't know if he ever did."). Ms. James also has submitted evidence of a complaint to Mr. Coleman on March 20, 2014 about Ms. Pillard's overall behavior toward her, and her belief that this behavior was racially motivated. *See* March 20, 2014 Letter ("The working conditions at this company are becoming unbearable, I feel being an African-American female has a lot to do with it. I feel the upper management feels a blatant disrespect and disregard for African-American authority."). That letter does not, however, specifically mention the use of any particular racial epithet.

Nevertheless, given the severity of the epithet involved and the testimony about its frequent use, even if it its frequency as well as its motivation is disputed, there is a genuine issue of material fact as to whether the use of racial epithets in this workplace was sufficiently severe or pervasive to have materially altered the terms and conditions of Ms. James's employment. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) ("Likewise, '[t]he question of whether a work environment is *sufficiently* hostile to violate Title VII is one of fact.'") (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001)); *Cruz*, 202 F.3d at 571 ("Although the district court characterized Bloom's racial harassment as occurring on 'only one occasion,' Cruz has adduced evidence that Bloom in fact subjected her and others to blatant racial epithets on a regular if not constant basis. From this evidence, a jury reasonably might

conclude that Bloom, a Coach supervisor, created a working environment that was hostile to

Cruz on the basis of her race.") (internal citations omitted); *Richardson*, 180 F.3d at 440 ("A

factfinder may well conclude that the ACF environment was not so objectionable as to alter

negatively the terms and conditions of a reasonable person's employment. We cannot, however,

say that the record evidence compels only that result. Accordingly, we hold that the district court

erred when it concluded as a matter of law that the ACF environment was not hostile within the

meaning of Title VII case law.").

Accordingly, Defendants' motion for summary judgment is denied as to Count Two.

### E.      Retaliation

Finally, Defendants argue that Ms. James has failed to establish that her termination was

an adverse employment action in retaliation for a protected activity under Title VII.

The Court agrees.

Title VII prohibits an employer from discriminating against an employee because the

employee has opposed an employment practice prohibited by Title VII. 42 U.S.C. § 2000e-3(a).

Title VII retaliation claims are "analyzed under the *McDonnell Douglas* burden-shifting test."

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). "Under this framework,

the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering

evidence that she 'participated in a protected activity,' 'suffered an adverse employment action,'

and 'that there was a causal connection between her engaging in the protected activity and the

adverse employment action.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir.

2015) (quoting *Gorzynski*, 596 F.3d at 110).

If the plaintiff establishes her *prima facie* case, that "creates a 'presumption of

retaliation,' which the defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason

for the adverse employment action.'" *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). If the defendant provides a neutral explanation for the adverse employment action, the presumption disappears and the plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013). The plaintiff bears a *de minimis* burden of establishing retaliation at the *prima facie* stage. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

Defendants do not dispute that Ms. James participated in at least one protected activity: the complaint she made on March 20, 2014. *See* March 20, 2014 Letter (letter from Ms. James to Timothy Coleman stating "I feel the upper management feels a blatant disrespect and disregard for African-American authority."). They also do not dispute that her termination constitutes an adverse employment action.[5] They contend, however, that because the complaint was made three months before she was fired, and Ms. James therefore cannot prove that her complaint was "in 'close and temporal proximity' to the date she was terminated," and she therefore cannot show a causal connection between her filing the complaint and her termination. Defs.' Mem. at 13.

Ms. James alleges that she made other complaints, both verbally and in writing, on multiple occasions. Ms. James argues that she "complained repeatedly, in writing, to her superiors about the racial harassment, the hostile work environment." Pl.'s Mem. at 12–13 (citing James Aff. ¶¶ 18, 26 (recounting conversations that Ms. James had with Ms. Darden and

---

[5] Ms. James also claims that Mr. Pena's decision after she was fired to close her business account with Restaurant Depot was an adverse employment action. Pl.'s Mem. at 13. The Court disagrees. While "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," it only protects an individual "from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. To satisfy this standard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations and internal quotation marks omitted). Because there is no evidence in the record that any other employee had a business account, Ms. James's account cancellation could not have sent such a message.

the Human Resources Department about "discrimination, harassment, and retaliation")). But there is no direct evidence of those other complaints in the record, apart from Ms. James's affidavit.

The Court therefore agrees with Defendants that Ms. James has failed to establish a causal connection between her complaints and her termination. *See Smith*, 579 F. Supp. 2d at 245 (finding that the plaintiff failed to establish a causal connection between protected conduct and termination). Although Ms. James has stated that she complained about discrimination and harassment to the human resources department, she has not offered evidence that would link those complaints to an adverse employment action. Moreover, the Court agrees with Defendants that the temporal proximity of Ms. James's March 20, 2014 complaint and her firing does not permit a reasonable factfinder to infer a causal connection between the two. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990) (finding that three-month gap between the plaintiff's agency complaint and the defendant's failure to hire the plaintiff insufficient to "fulfill the final requirement of a causal nexus between his filing of the agency complaint, on the one hand, and [the defendant's] refusal to hire him, on the other").

Defendants' motion for summary judgment on Count Three therefore is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is granted as to Counts One and Three, but denied as to Count Two.

**SO ORDERED** at Bridgeport, Connecticut, this 5th day of March, 2019.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge